UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

TAI DUC HOANG

CRIMINAL ACTION

NO. 23-5-JWD-EWD

**RULING AND ORDER**

This matter comes before the Court on the *Motion to Suppress* (Doc. 20) filed by Defendant Tai Duc Hoang ("Defendant" or "Hoang"). The Government filed a *Response to Defendant's Motion to Suppress* ("*Opposition*") (Doc. 22). The Court held a hearing on October 14, 2025. (Doc. 62.) The parties then filed post-hearing briefs. (Docs. 71, 72.) The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, Defendant's *Motion to Suppress* is denied.

**I.   BACKGROUND**

Defendant was paroled on April 26, 2021, (Doc. 20-2 at 1), and was, at all relevant times, under the supervision of Agent Lane Linton ("Linton") of the Louisiana Department of Public Safety and Corrections, Division of Probation and Parole, (Doc. 20-1 at 2; Doc. 22 at 1). Condition Nine of Defendant's certificate of parole stated: "I agree to visits at my residence or place of employment by my Parole Officer at any time. I also agree to searches of my person, property, residence, and/or vehicle, when reasonable suspicion exists that I am or have been engaged in criminal activity." (Doc. 20-3 at 1, ¶ 9.) Defendant signed this certificate on April 26, 2021, and again on April 28, 2021. (*Id.* at 1; *see also* Doc. 68 at 30–31.)

On July 27, 2022, Linton and Agent Jacob Drummond ("Drummond")—also with the Division of Probation and Parole—met Defendant and his girlfriend, Chanka Edwards

("Edwards"), at Defendant's home ("the Wynnewood Residence"), located at 8943 Wynnewood Street. (Doc. 20-4 at 2.) Linton advised Defendant that the agents "were there to conduct a residence check." (*Id.*) Shortly after entering the Wynnewood Residence, Linton "moved toward the kitchen area" and "opened the oven," where he found three firearms. (*Id.*) The agents detained Defendant and Edwards and contacted Supervisor Cass Mitchell, who in turn contacted the Baton Rouge Police Department ("BRPD"). (*Id.*) While waiting for BRPD, the agents continued searching the Wynnewood Residence. (*Id.*) Their initial search yielded "narcotics, firearms, [drug] paraphernalia, and currency." (Doc. 20-1 at 1.) BRPD subsequently obtained a search warrant and discovered and seized additional contraband. (Doc. 20-4 at 3.)

On February 9, 2023, Defendant was indicted by a federal grand jury for one count of possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), and one count of possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). (Doc. 1 at 1–2.) He was arrested on these federal charges on March 1, 2023. (Doc. 10 at 1.) He now moves to suppress all evidence seized, arguing that the agents searched his home "in violation of his limited right under the Fourth Amendment to be free from unreasonable searches and seizures." (Doc. 20-1 at 9; *accord* Doc. 71 at 11.)

## II. PARTIES' ARGUMENTS

### A. Initial Briefs

#### 1. *Defendant's Motion to Suppress (Doc. 20)*

Defendant recites the following facts: Linton made contact with Defendant outside of the Wynnewood Residence on July 27, 2022. (Doc. 20-1 at 2.) At the time, Defendant was accompanied by Edwards. (*Id.*) Defendant and Linton waited outside of the residence for Drummond. (*Id.*) Upon Drummond's arrival, Linton informed Defendant that the agents "were

2

there to do a residence check." (*Id.*) The agents, Defendant, and Edwards then entered the residence, where the agents "cleared the couch." (*Id.*) While Defendant and Edwards sat on the couch, Linton "moved to the kitchen." (*Id.*) At roughly the same time, Drummond allegedly "discovered a foregrip for an AR-15 style rifle." (*Id.*) With this discovery, Linton advised Defendant that "he would continue to *search* the residence." (*Id.* (emphasis added).) He opened the oven and "discovered three firearms." (*Id.*)

Defendant argues that Linton conducted a warrantless search of Defendant's home and that, as a consequence, "the Government bears the burden of proving the legality of the search." (*Id.* at 3–4; *see also id.* at 3 (citing, *inter alia*, *United States v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993)).) Defendant concedes that individuals on probation or parole have a diminished expectation of privacy, including in their homes. (*Id.* at 4–5 (citing *United States v. Knights*, 534 U.S. 112 (2001); *Samson v. California*, 547 U.S. 843 (2006)).) He notes, however, that the Fifth Circuit has held that the Government must still establish "reasonable suspicion that [a] probationer is engaged in criminal activity." (*Id.* at 6 (quoting *United States v. LeBlanc*, 490 F.3d 361, 365 (5th Cir. 2007)).) He proposes that the rule should be the same for parolees. (*Id.* at 6–7 (citing *United States v. Sharp*, 40 F.4th 749, 753 (6th Cir. 2022)).) Accordingly, "any search of [Defendant's] home . . . require[d] reasonable suspicion" beforehand. (*Id.* at 7.) Defendant contrasts a search with a "residence check," which can be suspicionless. (*Id.* (citing La. R.S. § 15:574.4.2(A)(2)(i)).)

Here, Defendant says, Linton *searched* the Wynnewood Residence. (*Id.* at 7–8.) But his report "contain[ed] no indication that he had reasonable suspicion of criminal activity prior to entering." (*Id.* at 8 (referencing Doc. 20-4 at 1–3).) In the alternative, Defendant argues that, even if Linton's initial entry was for the purpose of a residence check, it "at some point transformed into a search." (*Id.*) In particular, "the opening of the oven is a search by any definition." (*Id.*)

3

Thus, "[i]f Agent Linton did not have reasonable suspicion of criminal activity prior to opening the oven, then the search w[as] in violation of Mr. Hoang's Fourth Amendment rights." (*Id.* at 9.)

### 2. Government's Opposition (Doc. 22)

The Government responds that, before entering the Wynnewood Residence, Linton had learned "that Hoang, an individual under his supervision, was potentially recently involved in criminal activity" in Texas. (Doc. 22 at 1.) Relatedly, Linton knew that Defendant had recently been "arrested in Marksville, LA, for possession of marijuana." (*Id.*) Prior to the residence check at issue here, Linton had made "three previous attempts to visit [Defendant] at his home," all of which were "unsuccessful." (*Id.* at 1–2.)

The Government also notes that, shortly after entering the Wynnewood Residence on July 27, 2022, agents spotted a rifle foregrip "on a video game machine" near the front door. (*Id.* at 2.) Further, Linton "advised that . . . he could smell the strong odor of marijuana" upon entry. (*Id.*) Thus, he began a search. (*Id.*) As he moved into the kitchen, the smell of marijuana "became stronger." (*Id.*) Only at that point did Linton open the oven and discover the firearms hidden therein. (*Id.*)

As a condition of his parole, Defendant agreed to "visits at [his] residence or place of employment by [his] Parole Officer at any time." (*Id.* at 3 (quoting Doc. 22-1 at 1, ¶ 9).) He likewise agreed to "searches of [his] . . . residence . . . when reasonable suspicion exist[ed] that [he] [was] or ha[d] been engaged in criminal activity." (*Id.* (quoting Doc. 22-1 at 1, ¶ 9).) The Government does not dispute that Linton eventually conducted a search of the Wynnewood Residence. (*Id.*) Thus, "[t]he only question before the Court is the reasonableness of said search in conjunction with the [residence check]." (*Id.*) The Government contends that, upon entering the

4

Wynnewood Residence in order to conduct a residence check, the agents "observed the firearm foregrip" and therefore had reasonable suspicion "immediately." (*Id.* at 4.)

Alternatively, the Government says, the agents had "ample reasonable suspicion" prior to entering Defendant's home. (*Id.*) Linton was aware that Defendant may have been involved in criminal activity in Texas and that he had been arrested in Marksville. (*Id.*) "[I]n the month prior to the home visit and search in question, the defendant admitted to Agent Linton his inability to pass a drug screen." (*Id.*) And following Defendant's arrest in Marksville, "Linton tried numerous times to visit the defendant at his home[,] to no avail." (*Id.*) "[B]ased on the totality of the circumstances and his experiences with the defendant," Linton had reasonable suspicion *before* entering the Wynnewood residence. (*Id.*; *see also id.* (citing *United States v. Williams*, 880 F.3d 713, 720 (5th Cir. 2018)).)

### B. Suppression Hearing

At the hearing on October 14, 2025, the Court heard testimony from Agent Carroll "Trey" Landry ("Landry"), Drummond, and Linton. (Doc. 62 at 1; Doc. 68 at 2.)

#### 1. *Landry's Testimony*

Landry, a special agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified that, on July 27, 2022, he was called out to the Wynnewood Residence after the search had already taken place. (Doc. 68 at 4–5.) Landry explained that a rifle foregrip is not, "[i]n and of itself" illegal, but rather is "just a gun part," which anyone can easily purchase and which "even a prohibited person can possess." (*Id.* at 11–12.) He also speculated that the foregrip could attach to "a pellet gun or an airsoft gun." (*Id.* at 12.) However, Landry opined that—had he been the one to discover the foregrip—it would have been "a red flag" to him, because it is "immediately recogniz[able] . . . as a gun part" and because it functions to "help [a person] fire a rifle more

5

accurately." (*Id.*; *see also id.* at 14 (Question: "[I]f you were to come across [a rifle foregrip] in the possession of a prohibited person[,] would you find that suspicious?" Answer: "For sure.").)

### 2. Drummond's Testimony

Next, Drummond testified that, if a parole officer "anticipate[s] that [he] may find evidence" during a residence check, then he will "usually ask [another officer] to assist him." (*Id.* at 15.) Drummond had previously accompanied Linton on "[m]ore than five"—"probably" more than ten—checks of parolees' residences. (*Id.* at 20–21.) Prior to the residence check on July 27, 2022, Linton informed Drummond that: (1) "Mr. Hoang was arrested recently by another police department" for "misdemeanor drug possession," (2) Defendant had been "a victim of a robbery" in Marksville, and (3) "there could be a chance" that the Wynnewood Residence contained evidence of criminal activity. (*Id.* at 21–22; *see also id.* at 27–28.)

When Drummond arrived at the Wynnewood Residence on July 27, 2022, he observed Linton, Defendant, and Edwards "standing in the driveway." (*Id.* at 16.) The agents, Defendant, and Edwards entered the residence together. (*Id.*) Linton instructed Defendant and Edwards to sit on the couch. (*Id.*) Meanwhile, Drummond "observed a vertical foregrip attachment for a rifle on the video game machine to the left-hand side of the doorway." (*Id.* at 16–17, 22–23.) He informed Linton of the rifle foregrip, at which time Linton "walked to the back of the house to begin looking around." (*Id.* at 17.) In the kitchen—specifically, in the oven—Linton found three firearms. (*Id.* at 17–18.) Drummond agreed that Linton began searching the Wynnewood Residence "based on finding th[e] [rifle] foregrip." (*Id.* at 27.) Although the foregrip "[was] not illegal," Drummond testified that he found it "suspicious," especially because Defendant could not legally possess firearms. (*Id.* at 28.)

6

Drummond further testified that he noticed "[a] faint odor of marijuana" upon entering the Wynnewood Residence. (*Id.* at 16, 28.) He acknowledged that Linton's report did not mention the smell and opined that he "would have included" the detail had he authored the report. (*Id.* at 23.) But he also stated that he and Linton "probably" discussed the odor while at the residence. (*Id.*)

After finding the three firearms, the agents contacted their supervisor, who eventually contacted BRPD. (*Id.* at 17–18; *see also id.* at 46, 49, 64.) Body-worn camera footage shows Drummond pointing out the foregrip to BRPD officers. (*See id.* at 19.) Drummond testified that "generally between two and four" BRPD officers respond to a call. (*Id.* at 24.) Here, however, there were "at least five or six or seven." (*Id.* at 26.) According to Drummond, these officers "arrived as time went on," because BRPD was continuing to discover evidence. (*Id.* at 26–27.)

### 3. *Linton's Testimony*

Linton testified that, when visiting the Wynnewood Residence on January 3, 2022, he "could smell the odor of burnt marijuana." (*Id.* at 32–33.) Defendant admitted that he and Edwards "had been smoking marijuana in the house." (*Id.* at 33.) On that occasion, Linton did not conduct a search. (*Id.*) Subsequently, on June 3, 2022, Defendant requested permission to travel to Houston, Texas. (*Id.* at 33–34.) Another officer informed Defendant that he "needed to pass a drug screen." (*Id.* at 34.) Defendant again admitted to drug use but nevertheless received the travel permit. (*Id.*)

On June 6, 2022, the Tunica/Biloxi Police Department ("Tunica/Biloxi") called Linton in order to inform him that officers had arrested Defendant and Edwards in Marksville for "possession of marijuana" (i.e., simple possession). (*Id.* at 34–35.) Defendant had not told Linton "that he was . . . going to and staying in Marksville." (*Id.* at 36.) Based on the call, it was Linton's understanding that Edwards had reported that she and Defendant "were being robbed by someone with a semi-automatic weapon," (*id.* at 35), that Tunica/Biloxi officers had arrived on scene and

7

had chased a suspect, that the suspect had "tripped on an AC unit next to the . . . cabin" where Defendant and Edwards were staying, and that officers had subsequently located 2.5 pounds of marijuana "under/near an AC unit," (*id.* at 68).

Linton received a second phone call from Tunica/Biloxi on June 6, 2022. (*Id.* at 35.) An officer advised that surveillance footage of the Marksville incident showed "that there were some suspicious people [who] had been looking around" and "searching under" Defendant's vehicle. (*Id.* at 35, 56–57.) Officers had also located another two pounds of marijuana hidden near Defendant's rental cabin. (*Id.* at 35.) Tunica/Biloxi suggested to Linton "that Mr. Hoang may be involved in a larger drug trafficking/drug smuggling operation." (*Id.*; *see also id.* at 57 ("It just didn't seem . . . like a regular armed robbery [to Tunica/Biloxi].").) Linton did not review the surveillance footage, nor did he receive any incident reports or witness statements. (*Id.* at 59.)

On June 16, 2022, Linton left Defendant a voicemail and sent Defendant a text. (*Id.* at 36.) He did not recall receiving a response. (*Id.*) On June 22, 2022, Linton tried to visit the Wynnewood Residence, but "there was no answer or contact there." (*Id.*) Later that same day, however, Linton met Defendant at the parole office. (*Id.*) Linton instructed Defendant to forward docket information concerning the Marksville incident. (*Id.* at 37.) He did not recall receiving that information. (*Id.* at 37–38.) On July 11, 2022, Linton attempted a second residence check, again without success. (*Id.* at 38.) On July 26, 2022, Linton went to the Wynnewood Residence for the third time since the Marksville incident. (*Id.*) When no one answered the door, Linton called Defendant, who said that he was in Lafayette. (*Id.*) Defendant had not told Linton of this trip ahead of time. (*Id.* at 38–39.) Linton ordered Defendant to return to Baton Rouge "immediately." (*Id.* at 39.)

Finally, on July 27, 2022, Linton requested Drummond's assistance, voicing his suspicion that "there m[ight] be something in [Defendant's] residence." (*Id.* at 39–40; *see also id.* at 58

8

("[F]rom our past experience, we expected to find possibly some drugs . . . and possibly a weapon.").) Shortly after Linton arrived at the Wynnewood Residence, Defendant "drove up . . . in a black Dodge Charger Hellcat," which Linton had not seen before. (*Id.* at 40–41; *see also id.* at 44 (explaining that this "very expensive[-]looking vehicle" was suspicious because, to Linton's knowledge, Defendant only worked part-time for his family, which "operated some nail salons").) While standing in the driveway, Defendant explained to Linton that the vehicle belonged to Edwards. (*Id.* at 60–61; *see also id.* at 61 ("As far as I know, [Edwards] didn't work.").)

When Drummond arrived, the agents, Defendant, and Edwards entered the Wynnewood Residence. (*Id.* at 41–42.) Linton informed Defendant that the agents were "there to do a residence check." (*Id.* at 42.) He instructed Defendant and Edwards to sit on the couch. (*Id.*) As he "started to move towards the kitchen," Drummond pointed out the rifle foregrip. (*Id.*) Upon questioning, Defendant told Linton that the foregrip was there "when [he and Edwards] moved in[to] the house." (*Id.* at 43; *see also id.* at 61–62 ("He lived there for a while. If the foregrip came with the house, why didn't he throw it away?").) Linton testified that he then entered the kitchen and opened the oven because, "through experience and from . . . other officers, other agencies," he had learned that it was a "common place" where people "hide weapons, hide other illegal things." (*Id.* at 45.)

Linton also testified that "[t]here was a smell of marijuana in the house," (*id.* at 42), which became "stronger" as he entered the kitchen, (*id.* at 47). He stated that the smell is "not uncommon" in parolees' homes—and that he had previously noticed it in Defendant's home. (*Id.* at 47–48; *see also id.* at 32–33.) Partly because he "wasn't really surprised" by the smell, he unintentionally left it out of his report. (*Id.* at 48.) Linton acknowledged, however, that officers' "narrative notes [about encounters] include the important information," and that there was no mention of an odor of marijuana in his "very lengthy narrative entry" for July 27, 2022. (*Id.* at 51.) He reiterated that the

9

omission was "an oversight" and that, in retrospect, he would add the detail. (*Id.* at 52–53.) Linton claimed that the smell was one source of reasonable suspicion. (*Id.* at 53–55.) BRPD's report of the incident corroborated Linton's testimony about the smell. (*Id.* at 66–67.)

Linton was unequivocal that, when he went to the Wynnewood Residence on July 27, 2022, he planned to conduct a search. (*Id.* at 54.) He testified that the bases for the search were, *inter alia*, Defendant's use of controlled substances, "[t]he contact with the police department in Tunica/Biloxi, the fact that [Defendant] had been arrested [for] possession of marijuana, . . . the statement from [Tunica/Biloxi] that they believed that [Defendant] may be involved in a larger drug trafficking/drug smuggling operation," Defendant's traveling to Lafayette "without permission," "that fancy brand new car," the odor of marijuana, and the rifle foregrip. (*See id.* at 54–56, 61, 64; *see also id.* at 62 ("[A]s we kept moving forward, [it] seemed like there w[ere] more and more reasons to be suspicious . . . .").) Linton explained that, while not illegal, the foregrip "raise[d] suspicions" that Defendant had a firearm. (*Id.* at 62.) According to Linton, the search "was based on the totality of the circumstances." (*Id.* at 71.)

### C. Post-Hearing Briefs

#### 1. *Defendant's Post-Hearing Brief (Doc. 71)*

Defendant emphasizes that, during the hearing, Linton acknowledged that Tunica/Biloxi had arrested Defendant for misdemeanor drug possession, that officers did not find Defendant in possession of a large amount of marijuana, that Defendant had been the victim of a robbery, and that Defendant "could have been the victim of a larger gang-related activity." (Doc. 71 at 5 (emphasis omitted) (citing Doc. 68 at 58); *see also id.* at 6 (citing Doc. 68 at 69).) Linton also testified that he had not reviewed surveillance footage or reports of the Marksville incident. (*Id.* at

10

5–6.) Defendant underscores Linton's testimony that, when he went to the Wynnewood Residence on July 27, 2022, "he was planning on doing 'a search.'" (*Id.* at 5 (quoting Doc. 68 at 54).)

Defendant argues that the agents' testimony "narrows the legal issues in this case." (*Id.* at 7.) Specifically, the hearing established that Linton and Drummond *searched* the Wynnewood Residence. (*Id.*) Although both agents testified, at various points, that they initially went to the residence in order to conduct a residence check, (*see id.* at 8 (citing Doc. 68 at 15, 39, 42)), Linton eventually conceded that, from the outset, he planned to conduct a search, (*id.* (citing Doc. 68 at 54–55)). Thus, the agents needed reasonable suspicion, meaning that they needed to "be able to point to specific and articulable facts that, taken together with the rational inferences from those facts, reasonably warrant[ed] a belief . . . that a condition of parole ha[d] been or [wa]s being violated." (*Id.* at 8–9 (quoting *United States v. Scott*, 678 F.2d 32, 35 (5th Cir. 1982)).) According to Defendant, the agents lacked reasonable suspicion. (*Id.*)

Defendant contrasts the instant case with *Griffin v. Wisconsin*, where the Supreme Court held that a probation search was "justified by a police tip . . . that 'there were or might be guns in Griffin's apartment.'" (*Id.* at 9 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 871 (1987)).) Here, Tunica/Biloxi "did not tell Agent Linton that they suspected that Mr. Hoang had weapons or drugs in his residence." (*Id.*) Rather, they opined that he "*may* be involved in a larger drug trafficking/drug smuggling operation." (*Id.* (quoting Doc. 68 at 54–55).) And they only charged Defendant with simple possession. (*Id.*) Defendant adds that Linton himself "was not sure what he expected to find at Mr. Hoang's residence" when he and Drummond went to search it on July 27, 2022. (*Id.* at 10 (citing Doc. 68 at 22).)

According to Defendant, Linton's "additional reasons" for the search are unpersuasive. (*Id.*) Defendant notes that he explained to Linton that the car which he was driving on July 27,

11

2022, belonged to Edwards. (*Id.*) He also points out that Linton's report did not mention "a faint odor of marijuana" in the home. (*Id.*) Only BRPD's Street Crimes Unit documented the smell of marijuana. (*Id.*) Defendant argues that this "now defunct" unit "lack[s] . . . credibility," but regardless, their report conflicts with Linton's testimony at the hearing. (*Id.*) Finally, Defendant contends that the rifle foregrip was not a source of reasonable suspicion, because Defendant could legally possess it. (*Id.* at 10–11.) Thus, Defendant says, the search of the Wynnewood Residence "was not supported by reasonable suspicion." (*Id.* at 11.)

### 2. *Government's Post-Hearing Brief (Doc. 72)*

The Government reiterates that Linton and Drummond "conducted a residence check and subsequent search" of the Wynnewood Residence. (Doc. 72 at 1.) One of Defendant's parole conditions authorized residence checks "at any time," as well as "searches of [Defendant's] person, property, residence, and/or vehicle, when reasonable suspicion exist[ed] that [he] [was] or ha[d] been engaged in criminal activity." (*Id.* at 3–4 (quoting Doc. 22-1 at 1, ¶ 9).) The Government contends that, "[e]ven in the absence of any reasonable suspicion, Agent Linton was authorized to enter the defendant's home in connection with the home visit." (*Id.* at 4 (citing *LeBlanc*, 490 F.3d at 368–69).) This residence check "immediately resulted in reasonable suspicion": Upon entry, the agents "observed the firearm foregrip . . . and smelled marijuana." (*Id.*) In particular, the smell of marijuana "not only supports a finding of reasonable suspicion, but . . . was also enough to establish 'probable cause.'" (*Id.* at 5 (citing, *inter alia*, *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc)).) Although Linton did not include the smell of marijuana in his report, he "was candid with the [C]ourt and acknowledged that he should have included it." (*Id.* (citing Doc. 68 at 47–48).) Both Drummond and BRPD corroborated this detail. (*Id.* (citing Doc. 68 at 66–67).)

12

But even before entering the Wynnewood Residence, Linton had reasonable suspicion, because he "was aware of the defendant's recent arrest as well as [his] potential involvement in drug trafficking." (*Id.* at 4.) Additionally, in the month preceding the residence check, Defendant "admitted to Agent Linton his inability to pass a drug screen." (*Id.* at 4–5.) And following the Marksville incident, Linton attempted numerous visits to the Wynnewood Residence. (*Id.* at 5.) Finally, the Government notes that, on July 27, 2022, Defendant arrived at the Wynnewood Residence in a "'very expensive looking vehicle' that Agent Linton had not seen him driving before." (*Id.* (quoting Doc. 68 at 44); *see also id.* (citing *Williams*, 880 F.3d at 720).) "This was suspicious given the defendant's part-time employment at family run nail salons." (*Id.* (citing Doc. 68 at 44).)

Given the totality of the circumstances, the Government argues that Linton had reasonable suspicion to search the home. (*Id.* at 6.) "[E]ven in the absence of reasonable suspicion, a home visit was certainly justified[,] and reasonable suspicion developed upon entry into the home." (*Id.*)

### III. LEGAL STANDARD

The Fourth Amendment protects "against unreasonable searches and seizures" by law enforcement. U.S. Const. amend. IV. Individuals on parole, however, have a "significantly diminished" "reasonable expectation of privacy" due to their "knowing agreement to the parole condition[s] imposed in accordance with state law." *United States v. Meaux*, 797 F. App'x 892, 892 (5th Cir. 2020) (per curiam) (citing La. R.S. § 15:574.4.2(A)(2)(i) (2015); *Samson*, 547 U.S. at 852; *Knights*, 534 U.S. at 114, 119–20).

In *Griffin*, the Supreme Court concluded "that a warrantless, non-consensual search of a probationer's home on the basis of less than probable cause" can be "reasonable within the meaning of the Fourth Amendment." *United States v. Keith*, 375 F.3d 346, 349 (5th Cir. 2004)

13

(cleaned up) (quoting *Griffin*, 483 U.S. at 874, 880). Likewise, in *United States v. Knights*, the Court "upheld a warrantless search which was conducted pursuant to the terms of the defendant's state probation where law enforcement had reasonable suspicion that criminal activity was occurring." *United States v. Anderson*, 620 F. App'x 365, 366 (5th Cir. 2015) (per curiam) (citing *Knights*, 534 U.S. at 114, 121). In addition, the Court has held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Samson*, 547 U.S. at 857; *see also United States v. Taylor*, 482 F.3d 315, 319 n.2 (5th Cir. 2007) (citing *Samson*, 547 U.S. at 850).

### IV. ANALYSIS

#### A. Defendant's Status as Parolee

"[P]arolees enjoy even less of the average citizen's absolute liberty than do probationers." *United States v. Winding*, 817 F.3d 910, 916 (5th Cir. 2016) (quoting *Samson*, 547 U.S. at 850). The Supreme Court has specifically "upheld the warrantless non-consensual search of a probationer's home based upon," *inter alia*, tips from other law enforcement officers. *Keith*, 375 F.3d at 349 (citing *Griffin*, 483 U.S. at 870–71); *see also Williams*, 880 F.3d at 719–20 (citing *Griffin*, 483 U.S. at 879–80) (explaining that, per *Griffin*, "tips given to a probation officer from other law enforcement officers are sufficient to support reasonable suspicion to conduct a search of a probationer"). In making this determination, the Court "found that a warrant requirement would 'interfere to an appreciable degree' with the ability of the probation system to adequately supervise probationers by 'mak[ing] it more difficult for probation officials to respond quickly to evidence of misconduct' and 'reduc[ing] the deterrent effect that the possibility of expeditious searches would otherwise create.'" *Keith*, 375 F.3d at 349 (quoting *Griffin*, 483 U.S. at 876).

14

At all relevant times, Defendant was on parole, (Doc. 20-2 at 1)—more specifically, under Linton's supervision, (Doc. 20-1 at 2). Defendant signed a certificate of parole on April 26, 2021, and again on April 28, 2021. (Doc. 20-3 at 1.) Condition Nine of that certificate read: "I agree to visits at my residence . . . by my Parole Officer at any time. I also agree to searches of my . . . residence . . . when reasonable suspicion exists that I am or have been engaged in criminal activity." (*Id.* at 1, ¶ 9.)

Defendant argues that Linton and Drummond conducted a search, not a residence check. (Doc. 20-1 at 7–8; Doc. 71 at 7–8.) Indeed, Linton himself testified that, when he arrived at the Wynnewood Residence, he planned to conduct a search. (Doc. 68 at 54.) The Government responds that Linton and Drummond initially conducted a residence check, which graduated to a search after the agents smelled marijuana and saw the rifle foregrip. (Doc. 22 at 2–3; Doc. 72 at 3–4.) The Court need not resolve whether, from the moment they entered the Wynnewood Residence, the agents were engaged in a residence check or a search. Assuming, *arguendo*, that the agents were, from the outset, conducting a search, the Court nonetheless finds that they had the requisite reasonable suspicion. (*See also* Doc. 22 at 4; Doc. 72 at 4–5.)

### B. Reasonable Suspicion

Louisiana Revised Statutes § 15:574.4.2 provides that a parolee must agree "to searches of person, property, residence, or vehicle, when reasonable suspicion exists that criminal activity has been engaged in while on parole." La. R.S. § 15:574.4.2(A)(2)(i). The statute "does not state that the criminal activity must have taken place at the property, residence, or vehicle to be searched, nor does it set a time limit on the criminal activity other than 'while on parole.'" *United States v. Quinn*, No. 24-3, 2025 WL 2943091, at *9 (M.D. La. Oct. 17, 2025) (deGravelles, J.) (citing La. R.S. § 15:574.4.2(A)(2)(i)). Nor does Condition Nine of the parole certificate impose such

15

limitations. (*See* Doc. 20-3 at 1, ¶ 9); *see also Meaux*, 797 F. App'x at 893 (citing *Knights*, 534 U.S. at 118–20; *Samson* 547 U.S. at 852) ("The [parole] condition itself is a 'salient circumstance' in determining the reasonableness of the search." (quoting *Knights*, 534 U.S. at 118)).

The Fifth Circuit has articulated the "reasonable suspicion" standard for a situation like this one: Reasonable suspicion "requires no more than that the authority acting be able to point to specific and articulable facts that, taken together with rational inferences from those facts, reasonably warrant a belief . . . that a condition of parole has been or is being violated." *Scott*, 678 F.2d at 35; *accord Bates v. Normand*, 703 F. Supp. 3d 775, 788 (W.D. La. 2023); *Dimes v. Tanner*, No. 19-13712, 2021 WL 3146292, at *7 (E.D. La. June 22, 2021). Bases for reasonable suspicion include tips from other law enforcement officers, as well as the supervising parole officer's familiarity and history with the individual on parole. *See, e.g.*, *Meaux*, 797 F. App'x at 892–93; *Williams*, 880 F.3d at 715–16, 718, 720 (citing *Griffin*, 483 U.S. at 879–80); *see also Griffin*, 483 U.S. at 879 ("The [probation] agency . . . must be able to proceed on the basis of its entire experience with the probationer, and to assess probabilities in the light of its knowledge of his life, character, and circumstances.").

In order to search the Wynnewood Residence, Linton needed reasonable suspicion that Defendant "[was] or ha[d] been engaged in criminal activity." (Doc. 20-3 at 1, ¶ 9); *see also Anderson*, 620 F. App'x at 366 (citing *Knights*, 534 U.S. at 114, 121) (explaining that, in *Knights*, the Supreme Court upheld the warrantless search because "law enforcement had reasonable suspicion that criminal activity was occurring"). Even before entering the residence on July 27, 2022, Linton had reasonable suspicion. First, during a residence check on January 3, 2022, Linton smelled marijuana; at the time, Defendant admitted that he had been smoking marijuana inside the

16

residence. (Doc. 68 at 32–33.) And when Defendant requested a travel permit on June 3, 2022, he admitted to another officer that he would fail a drug screen, if administered. (*Id.* at 33–34.)

Second, after traveling to Houston, Defendant stopped in Marksville without informing Linton. (*Id.* at 36.) While there, he and Edwards were robbed "by someone with a semi-automatic weapon." (*Id.* at 35, 68.) On June 6, 2022, Tunica/Biloxi informed Linton that officers had arrived on scene and had chased a suspect, that officers had recovered 2.5 pounds of marijuana near where Defendant was staying, and that officers had arrested Defendant for simple possession of marijuana. (*Id.* at 34–35.) Later that same day, Tunica/Biloxi informed Linton that officers had located another two pounds of marijuana near where Defendant was staying and that surveillance footage of the incident showed "that there were some suspicious people [who] had been looking around" and "searching under" Defendant's vehicle. (*Id.* at 35, 56–57.) Tunica/Biloxi suggested to Linton "that Mr. Hoang may be involved in a larger drug trafficking/drug smuggling operation." (*Id.* at 35; *see also id.* at 57 ("It just didn't seem . . . like a regular armed robbery [to Tunica/Biloxi].").)

The fact that Linton did not review surveillance footage or reports of the Marksville incident, (*id.* at 59), does not affect whether the information and opinions provided by Tunica/Biloxi contributed to Linton's reasonable suspicion, *see, e.g.*, *Scott*, 678 F.2d at 35 ("Where the parole officer discovers *or is apprised of such facts*, we think that he will seldom be found at fault in acting upon them . . . ." (emphasis added)). Linton also knew that Defendant was on parole after being convicted of felony drug-distribution. (*See* Doc. 68 at 40.) The Fifth Circuit has regularly found reasonable suspicion based, in whole or in part, upon similar circumstances. *See, e.g.*, *Meaux*, 797 F. App'x at 892–93 (finding probable cause based, in part, on "a tip . . . from detectives with the Crowley Police Department that [the parolee] was the suspect in a recent armed

17

robbery" and the supervising officer's own "knowledge of [the parolee's] history of armed robbery charges and simple robbery convictions"); *Scott*, 678 F.2d at 35 ("What we have said disposes of the suggestion that the action of Scott's parole officer was somehow invalid because the facts upon which she acted came to her via a postal inspector, rather than as a result of her own investigations."); *Keith*, 375 F.3d at 351 ("Agent Myers was acting on information received by the police from a person engaged in the retail business in the same rural community where the defendant lived, who knew the defendant and knew of the defendant's prior involvement in building and detonating bombs.").

Third, Linton had considerable difficulty making contact with Defendant after the Marksville incident. In particular, Linton went to the Wynnewood Residence on June 22, July 11, and July 26, 2022, in order to conduct a residence check. (*Id.* at 36–39.) All three visits were unsuccessful. (*Id.*) Immediately after the third attempt, Linton called Defendant, who—for the first time—informed Linton that he had traveled to Lafayette without permission. (*See id.* at 38–39, 56 ("[H]e was not supposed to be there and didn't notify [Linton] that he had left . . . .").)

Based on the totality of the circumstances, (*see id.* at 71)—Defendant's multiple admissions of drug use, the Marksville incident, Defendant's arrest for simple possession of marijuana, Tunica/Biloxi's suggestion that Defendant "may be involved in a larger drug trafficking/drug smuggling operation," Linton's knowledge of Defendant's conviction for felony drug-distribution, the three unsuccessful visits to the Wynnewood Residence after the Marksville incident, and Defendant's traveling to Lafayette without notice or permission, (*see id.* at 54–56, 61, 63–64)—Linton had reasonable suspicion that Defendant "[was] or ha[d] been engaged in criminal activity," (*see* Doc. 20-3 at 1, ¶ 9). The "very expensive[-]looking vehicle" which Defendant was driving on July 27, 2022, heightened Linton's suspicion because, to his knowledge,

18

Defendant worked part-time at family-owned nail salons, and Edwards "didn't work." (*Id.* at 40–41, 44, 55, 60–61; *see also id.* at 62.) Thus, before Linton entered the Wynnewood Residence on July 27, 2022, he had reasonable suspicion that Defendant had been or was engaged in criminal activity, in violation of the conditions of his parole. Because Defendant was on parole, no more was needed. *See Scott*, 678 F.2d at 35. Linton's search of the Wynnewood Residence was valid.

V. **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendant's *Motion to Suppress* (Doc. 20) is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>February 5, 2026</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**